UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAJ BARTLETT LUDLOW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 10-0236 |
| | ) (HKK) |
| RAYMOND E. MABUS, JR., | ) |
| Secretary of the Navy, | ) |
| | ) |
| Defendant | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment. Plaintiff also respectfully requests that this Court grant Plaintiff's cross-motion for summary judgment. The administrative record demonstrates that the Board for Correction of Naval Records' (BCNR) decision to deny Plaintiff's request for the correction of his naval record was not supported by substantial evidence and was arbitrary, capricious, or otherwise contrary to regulation or law.

**I.  INTRODUCTION**

There exists two fundamental errors. The BCNR failed to recognize that Plaintiff's adverse performance evaluation (fitness report) was done contrary to regulation or law. Plaintiff received a non-observed (the Reporting Senior did not personally observe Plaintiff's performance during the reporting period) adverse fitness report containing derogatory material. AR 1. Marine Corps regulation, MCO P1610.7E, para. 4003.5, requires that a Reporting Senior "exercise extreme care to ensure that the derogatory material is an incontrovertible matter of fact or is a matter acknowledged to be true by the [Marine Reported On - Plaintiff]." As discussed below, the derogatory material in Plaintiff's fitness report was not incontrovertible matter of fact

1

or acknowledged to be true by Plaintiff. In some instances, the derogatory material was demonstrably false.

The BCNR adopted the wrong standard of review for determining whether the Reporting Senior erred in including the derogatory material in the fitness report. Under Marine Corps regulations, the BCNR should have tested the derogatory material contained in the non-observed report for whether it was "incontrovertible matter of fact" rather than whether it was "sufficiently objective." Marine Corps regulations make a distinction between observed and non-observed evaluations. MCO P1610.7E, para. 3006. Not observed reports are reserved for situations where the reporting senior has insufficient observation of the Marine's performance. *Id.* Plainly, the standard must be higher (incontrovertible matter of fact or acknowledged to be true) when a Reporting Senior who does not observe a Marine's adverse performance comments on any alleged deficiencies in the Marine's performance.

In an advisory opinion to the BCNR, Headquarters Marine Corps articulated the wrong standard for inclusion of derogatory information in a non-observed adverse fitness report. AR 27-30. In denying Plaintiff relief, the BCNR stated that the Board "substantially concurred" with the advisory opinion. AR 14.

The advisory opinion concluded that because the derogatory material was based on an investigation, the material was therefore "sufficiently objective to support the fitness report." AR 29. The "sufficiently objective" standard is not found in MCO P1610.7E. That standard is further contrary to the requirement that the extreme caution be taken to ensure that derogatory information be "incontrovertible matter of fact" or "acknowledged to be true." The adoption, or substantial concurrence, of an incorrect standard was arbitrary, capricious, or otherwise contrary to the law. Had the BCNR tested the Reporting Senior's discretion for "incontrovertible matter

2

of fact," the BCNR would have granted relief. It was probable material error for the Reporting Senior to include demonstrably false allegations in a fitness report.

Even assuming that the BCNR applied the appropriate standards, the fitness report was filled with multiple instances of derogatory material that were substantively inaccurate. The Board's failure to find probable material error, substantive inaccuracy, or injustice in the report was not supported by the record.

## II. STATEMENT OF FACTS

Plaintiff respectfully refers the Court to Plaintiff's Statement of Material Facts to Which There is No Genuine Dispute filed with this memorandum.

## III. STATUTORY AND REGULATORY BACKGROUND OF THE BCNR

Plaintiff agrees with Defendant's summary of the statutory and regulatory background of the BCNR. Document Number (DN) 7 at ¶ 5. As noted by Defendant, federal regulations require that the BCNR put their decision in writing with a brief statement for denial including all the essential facts upon which the denial was based. 32 C.F.R. § 723.3(e)(3). We would also note that the BCNR's denial of Plaintiff's request for reconsideration is at AR 14. The original decision of the BCNR is at AR 25-26. The decision was two pages long. The Board wrote:

> "After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice. In this connection, the Board substantially concurred with the comments contained in the advisory opinion and the report of the PERB [Marine Corps Performance Evaluation Review Board]." AR 35.

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Plaintiff

agrees with Defendant that in an action under the Administrative Procedure Act, summary judgment functions as a mechanism for the Court's to determine whether, as a matter of law, the final decision of the BCNR was "arbitrary and capricious, contrary to law, or unsupported by substantial evidence." 5 U.S.C. § 706 (2)(2000); *Roberts v. Harvey*, 441 F.Supp.2d 111, 118 (D.D.C. 2006)(citations omitted). DN 7 at ¶ 8.

A reviewing court should not uphold "a decision of less than ideal clarity" unless "the agency's path may reasonably be discerned." *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (*citing Bowman Transp., Inc. v. Arkansas-Best Motor Freight System*, 419 U.S. 281, 286 (1974)). Plaintiff agrees that all that is required is that the agency's decisions "minimally contain a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*citation omitted*); *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997), *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514-15 (D.C. Cir. 1989); *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986). If the basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the court] will make the reference." *Miller*, 801 F.2d at 497 (*quoting Environmental Defense Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972)).

As Defendant notes, final decisions of the BCNR are reviewed with a high degree of deference. *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514 (D.C.Cir. 1989). Decisions of the BCNR, however, are not utterly unreviewable. The BCNR must give a reason that a court can measure against the arbitrary and capricious standard of the APA. *Id.* A military decision may be challenged if there is a specific constitutional, statutory, or regulatory violation. *Bond v. United States*, 47 Fed. Cl. 641, 648 (2000). It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all. *Id.*

4

## V. LEGAL ANALYSIS

### A. THE BCNR'S DETERMINATION TO DENY PLAINTIFF'S REQUEST FOR THE CORRECTION OF HIS NAVAL RECORDS SHOULD NOT BE UPHELD BECAUSE IT WAS NOT BASED ON FACTS AND EVIDENCE IN THE ADMINISTRATIVE RECORD.

Regardless of the degree of deference afforded an administrative board, Plaintiff's contested fitness report contained so many factual inaccuracies and lack of support in the record that the Board should have granted relief. As noted above, the BCNR's decision was two pages long. They relied primarily on the advisory opinion from Headquarters Marine Corps. The advisory opinion was three pages long in substance, most of which summarized Plaintiff's position. AR 36-38. Plaintiff's supplemental statement to the Board, also a part of the record, was 21 pages and provided clear evidence of substantive inaccuracies in the fitness report. AR 78-98.

The BCNR's two-page opinion is of less than ideal clarity and their resolution of the facts cannot be reasonably discerned from the record. The BCNR and advisory opinion plainly ignored the clear evidence Plaintiff provided and relied on the findings of the command investigation in denying relief.

### B. THE BCNR INCORRECTLY DETERMINED THAT PLAINTIFF FAILED TO COMPLY WITH SQUADRON, MAG, WING, AND OPNAV DIRECTIVES

#### 1. Aircrew Standardization

Defendant misstates Plaintiff's position regarding the derogatory information in the fitness report on aircrew standardization. DN 7 ¶ 11. In Block 1 of the contested fitness report, the Reporting Senior wrote that Plaintiff "routinely failed to comply with squadron, [Marine Air Group], Wing, and OPNAV [Navy] <u>directives</u> pertaining to aircrew standardization..." (Our underlined emphasis added) AR 2.

5

Defendant suggests that Plaintiff's argument is that because the word "aircrew standardization" does not appear in the investigation, Plaintiff was not "derelict in complying with regulations pertaining to aircrew standardization." *Id.* Plaintiff's point is that throughout this process there has never been any references to specific regulatory provisions that Plaintiff was allegedly not in compliance with. According to Defendant, the Board found that there were "severe lapses in the development of flight standard operating procedures (SOP), aircrew training and briefings that evince Plaintiff's failure to maintain aircrew standardization." DN 7 ¶ 15. The fitness report does not allege "severe lapses." The fitness report alleges the routine failure to comply with directives. In the absence of any evidence in the investigation or even citation to specific directives that Plaintiff failed to comply with, there is clear material error, substantive inaccuracy, and injustice.

Defendant identifies multiple areas of the command investigation that Defendant believes supports a finding that Plaintiff failed to comply with squadron, MAG, Wing, and OPNAV directives. A closer look at the administrative record, however, demonstrates otherwise. Defendant first states that:

> "As a result of the IO's investigation the Board correctly attributed Condor 11's lack of situational awareness to the section leader's failure to create uniform expectations about the conduct of the mishap flight, and a failure to employ standard formation principles." DN 7 ¶ 15.

Defendant cites to AR 166 and AR 214-215 for that proposition though neither citation is pertinent to Plaintiff's conduct. At AR 166, the Investigating Officer stated that the proximate cause of the mishap was "Condor 11...colliding with Condor 10 (Section Leader)." Obviously, Plaintiff was not the Section Leader in the collision. He was the Detachment Officer in Charge. The Investigating Officer further concluded that "Condor 11's lack of situational awareness was due to the Flight Leader's (Condor 10) failure to create uniform expectations about the conduct

6

of the mishap flight..." AR 166 does not even mention Plaintiff, nor does it suggest that he violated any specific directive.

The citation to AR 214-215 is a reference to the Investigating Officer's opinions. The Investigating Officer concluded that the "chain of events and decisions that set the conditions for the mishap can be traced back to HMH-464 Detachment Bravo's Task Organization and extends through the mishap itself." Major General Timothy Ghormley wrote that "the manning and training shortfalls were not the choice of Major Ludlow, rather cards dealt by higher headquarters..." AR 109. There is no mention of the responsibilities of the Detachment Officer in Charge at AR 214-215. More importantly, there is no mention of any violation of any directive by Plaintiff.

Defendant next states that "two service members involved in the mishap did not receive training in Combat Survival, Water Survival or Underwater Egress, which are mandatory for all aircrew personnel." DN 7 ¶ 15. Defendant cites to AR 183. The mishap had resulted in the deaths of eight Marines and two United States Air Force Airmen. AR 165. The names of the two individuals are redacted. At AR 165, Finding of Fact 175, the Investigating Officer begins a series of findings assessing the training and qualifications of the two Air Force personnel. At Findings of Facts 175-178 he notes that the two personnel who did not receive training in combat survival, water survival, or underwater egress were Air Force. There is no allegation in the investigation alleging that Plaintiff violated any specific directive in failing to ensure that Air Force personnel not under his administrative control were trained.

Again, neither the investigation nor Defendant has provided any citation to a specific directive that Plaintiff violated. Defendant noted that "a workable...flight SOP might have facilitated uniform expectations..." DN 7 ¶ 15. Again, however, there is no reference to any directive requiring detachment commanders to create standard operating procedures. Moreover,

there is no evidence than any other detachment was required to formulate a standard operating procedure. As a matter of policy, detachments are too small to be saddled with the administrative burden of creating standard operating procedures during combat operations. That is precisely why we have higher headquarters.

Defendant then states that "Plaintiff acknowledged the lack of an SOP for flight operations in the Horn of Africa..." DN 7 ¶ 15. Plaintiff, however, did not acknowledge any violation of squadron, MAG, Wing, and OPNAV directives. The suggestion in the fitness report that Plaintiff "routinely failed to comply with...directives pertaining to aircrew standardization..." is false and unsupported by the administrative record. That comment is a substantive inaccuracy that BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

### 2. Human Factors Council

In Block I of the contested fitness report, the Reporting Senior wrote that Plaintiff "routinely failed to comply with squadron, [Marine Air Group], Wing, and OPNAV [Navy] <u>directives</u> pertaining to...human factors..." (Our underlined emphasis added) AR 2. Plaintiff's position is that, even with an Aviation Safety Officer billet, MCO 5100.29 does not require detachments to hold formalized human factors councils. Nonetheless, Plaintiff did, in fact, hold informal boards. Even in Defendant's memorandum, Defendant cannot cite a specific squadron, Wing, or OPNAV directive requiring small detachments to hold formal human factors councils.

Defendant's only answer is "[w]hile MCO 5100.29A mandates that squadrons and squadron commanders are responsible for monthly Human Factors Councils, it does not absolve small detachments from the responsibility if the command maintains an Aviation Safety Officer." DN 7 ¶ 16. The Investigating Officer, of course, noted that the detachment task organization did not "have a stand-alone Aviation Safety Officer." In other words, the Aviation

Safety Officer of Detachment-Bravo held multiple billets. AR 169. As Major General Timothy Ghormley noted, "the manning and training shortfalls were not the choice of Major Ludlow, rather cards dealt by higher headquarters..." AR 109.

Moreover, even the investigation was internally inconsistent on the requirement to hold human factors councils. Finding of Fact 28 of the investigation stated that the detachment did not conduct Human Factors Councils. AR 171. Finding of Fact 29 stated that "MCO 5100.29A mandates that Squadrons conduct monthly Human Factors Councils." AR 171. In that regard, the investigation does not conclude that Plaintiff, at the detachment level, was in violation of any directives.

Defendant's citations to the regulations are not clear. Defendant cites MCO 5100.29A, Encl (2), 2(h). It seems that the citation should have been to Encl (3), 2(h), which states in pertinent part that the Aviation Safety Officer should:

> "h. Convene human factors council meetings, not less than monthly. Membership will be in accordance with the current issuance of OPNAVINST 3750.6. Minutes shall only be kept by the commanding officer.
>
> i. Convene human factors boards as directed by the commanding officer. Membership will be in accordance with the current issuance of OPNAVINST 3750.6."

OPNAVINST 3750.6 states that commanding officers have two methods by which they may stay appraised of human factors. The directive states:

> "The first is a regular, proactive, informal, human factors review of all officer and enlisted aircrew. The second is a formal review conducted whenever the commanding officer thinks it is necessary.." OPNAVINST 3750.6R, para. 205 (f) (page 52-53 of Document 7-6).

Though Plaintiff did not hold formal reviews, he did hold "regular, proactive, informal, human factors reviews." AR 103-104. The flight surgeon, LCDR David Haynes, noted that:

> "On [Plaintiff's] instruction, I conducted numerous safety flight lectures to mitigate human factors as well as bi-monthly Human Factors meetings with the various departments. I would typically meet individually with the Safety Officer,

9

>Maintenance Officer, senior enlisted member and DET OIC, Maj Ludlow, to discuss Human Factors." AR 249.

The suggestion that Plaintiff "routinely failed to comply with squadron, [Marine Air Group], Wing, and OPNAV [Navy] <u>directives</u> pertaining to…human factors" is false and unsupported by the record. The comment is a substantive inaccuracy that BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

### 3. Incident Reporting

The contested fitness report also says that Plaintiff "routinely failed to comply with squadron, [Marine Air Group], Wing, and OPNAV [Navy] <u>directives</u> pertaining to…incident reporting" (Our underlined emphasis added) AR 2. Defendant's view is that "2d MAW SOP…required the Det-B to report all aircraft mishaps and potentially significant incidents through the 2d MAW Aviation Flash Report Database." DN 7 ¶ 17.

This is another instance where the investigation came to the wrong conclusion. Defendant identifies only a January 2006 mishap as the basis for the comment in the fitness report. DN 7 ¶ 17. Defendant does not cite to the specific provision in the 2d MAW SOP for mishap reporting requirements. Plaintiff, however, pointed out to the Board that he did not have to report the mishap because it did not meet the threshold for reporting under OPNAV 3750.6R (Naval Aviation Safety Program). AR 95. Under the OPNAV, incidents were not reportable if the injury resulted in four or less lost workdays and damage to the vehicle did not exceed $20,000.00. *Id.*

Plaintiff, in our submission to the BCNR, provided a Government Inspection and Maintenance Worksheet contradicting the findings of the investigation. AR 251. Enclosure M demonstrated that the mishap damage was $16,522.40. AR 95. Further, Plaintiff demonstrated that the incident resulted in less than four lost workdays. AR 95. As such, Plaintiff was not

10

required to report the January 2006 mishap. At the risk of being repetitive, the suggestion that Plaintiff "routinely failed to comply with squadron, [Marine Air Group], Wing, and OPNAV [Navy] <u>directives</u> pertaining to…incident reporting" is false and unsupported by the record. The comment is a substantive inaccuracy that BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

### C. PLAINTIFF DID NOT ROUTINELY DIRECT AND APPROVE DECEPTIVE FLIGHT SCHEDULING.

In the contested fitness report, the Reporting Senior wrote that Plaintiff "routinely directed and approved deceptive flight scheduling, wherein scheduled missions were never intended to be flown as indicated on the schedule." AR 2. There is no support in the administrative record for the suggestion that Plaintiff's flight scheduling was routinely "deceptive."

Defendant's only citation to the investigation was the opinion at AR 146 that Plaintiff and other officers "failed to recognize serious safety of flight issues, or if they did recognize them failed to take appropriate action to remediate or correct the issues." DN 7 ¶ 18. That opinion does not support a conclusion that Plaintiff "routinely directed and approved deceptive flight scheduling…" Part of the problem in this case is that the Marine Corps, in an effort to spread the blame for the helicopter mishap throughout the detachment without blaming higher headquarters, drew unsupportable inferences from the investigation.

Defendant also states that Plaintiff "implicitly acknowledges the potentially misleading/deceptive nature of his actions…" DN 7 ¶ 18. Plaintiff did not implicitly acknowledge anything. Plaintiff has previously stated that because of a limited number of missions and an unknown threat environment, several missions were scheduled in the same flight to cover potential flight contingencies and to ensure combat proficiency. AR 3. Plaintiff further

provided a letter to the Board from his superior, Colonel Trafton. AR 113. Colonel Trafton stated:

> "I was Major Ludlow's reporting senior and observed his conduct on a daily basis before, during and after the time of the mishap....I have read some descriptions of Major Ludlow's performance by personnel who were not present to observe it; they include phrases like 'routinely failed,' "deceptive flight scheduling" and "withheld critical information." These comments do not reflect my direct observation of Major Ludlow's actions on a daily basis..." AR 113.

There was no admission that he routinely directed and approved deceptive flight scheduling.

Defendant concludes that the "bottom line is whether Plaintiff's approval of flight scheduling was intentionally deceptive or simply misleading, it resulted in unclear expectations and assessments of risks that were contributing factors to the mishap." DN 7 ¶ 19. For this proposition, Defendant cites AR 215-217. At AR 215, the Investigating Officer notes that Captain Willard, the mission commander, developed an ad hoc mission plan. The opinions at AR 216 also are a continuation of findings related to Captain Willard's ad hoc flight plans. The only mention of Plaintiff is at AR 217, number 9. It states that Plaintiff underestimated the hazards associated with conducting a certain type of navigation without checkpoints and a route. AR 217.

The bottom line is that Plaintiff's fitness report alleges that he "routinely directed and approved deceptive flight scheduling, wherein scheduled mission were never intended to be flown as indicated on the schedule." That proposition is unsupported by the record. Not only is it unsupported by the record, but Plaintiff provided a letter from his Reporting Senior who observed him on a daily basis and stated that it was untrue. Likewise, Colonel Mark Dungan provided a letter stating that Plaintiff "conducted detachment scheduling and training consistent with three different CH-53 detachment commanders during my command time at Camp Lemonier." AR 245. The comment in the fitness report is a substantive inaccuracy that BCNR

should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

## D. PLAINTIFF'S ACTIONS CONCERNING THE JANUARY 2006 FLIGHT INCIDENT.

### 1. The Withholding Of Critical Information.

The contested fitness report alleges that Plaintiff "withheld critical information from his squadron commanding officer regarding a flight incident in Jan 2006 involving a mishap section leader..." AR 7. There are no facts in the command investigation or administrative record supporting the notion that Plaintiff withheld any information from his commanding officer. The basis for that conclusion is unclear. Plaintiff noted in his submission to the BCNR that the statement may have been based on the mishap board investigation, which was confidential and could not be used in a punitive manner against Plaintiff under OPNAVINST 3750. AR 86. The mishap board investigation is not a part of the administrative record.

The only place in the administrative record containing the allegation that Plaintiff withheld critical information from his commanding officer is the contested fitness report. Colonel Martinez wrote a letter indicating that Plaintiff was always forthright and honest. AR 248. Plaintiff provided clear evidence rebutting the allegation that he withheld critical information from his commanding officer.

Derogatory material in a non-observed adverse fitness report must be incontrovertible matter of fact or acknowledged to be true by Plaintiff. There is nowhere in the administrative record demonstrating that Plaintiff withheld critical information from his commanding officer. The comment is a substantive inaccuracy that BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

## 2. Plaintiff Did Not Fail to Activate a Mishap Investigation.

The contested fitness report also alleges that Plaintiff "withheld critical information from his squadron commanding officer regarding a flight incident in Jan 2006 involving a mishap section leader , <u>and failed to activate a mishap investigation, which was warranted by the likely degree of injury to ground personnel and damage to a vehicle during the evolution.</u>" (Our underlined emphasis added). AR 7. Defendant cites to AR 171 for support that the mishap was a Class B mishap and required an investigation. DN 7 ¶ 20. AR 171 does not specifically state that the incident was a Class B mishap.

Plaintiff has previously noted why the investigation was incorrect. Under OPNAV 3750.6R, incidents were not reportable if the injury resulted in four or less lost workdays and damage to the aircraft did not exceed $20,000.00. Defendant's citation to AR 171 erroneously cites a Kellogg, Brown, and Root estimate that the damage to the vehicle was $31,192.00. Plaintiff, at Enclosure M provided the actual KBR estimate. AR 251.

KBR concluded that the damaged vehicle was valued at $18,212.60. They calculated that value by subtracting the estimated damage ($16,522.40) from the acquisition cost of the vehicle ($34,735.00). Further, Colonel Fisher noted that the damage to the vehicle was repairable and that one injured soldier was treated and returned to full duty. AR 243.

Again, there are no accurate facts in the administrative record classifying the incident as a Class B mishap. Further, Plaintiff provided BCNR with everything they needed to conclude that the fitness report was inaccurate. Plaintiff provided the applicable regulations. AR 95. Plaintiff provided the KBR estimate. AR 251. Plaintiff also provided a letter from the Camp Commandant indicating that the damage to the vehicle was repairable and that at least one injured soldier was quickly returned to full duty. AR 243. The BCNR ignored all of this evidence and accepted the demonstrably incorrect conclusion of the investigation. The comment

is a substantive inaccuracy that BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

### E. PLAINTIFF'S ACTIONS CONCERNING THE JANUARY 2005 FLIGHT INCIDENT.

The Reporting Senior commented in the fitness report that Plaintiff "withheld information from his commanding officer about a Jul 2005 flight incident…He also withheld it from the aircraft mishap board…and from the field flight performance board…" AR 7. In the contested fitness report, the Reporting Senior very clearly states that the report is adverse due to the findings of the "MARCENT command investigation into circumstances of the HMH-464 class A flight mishap in Djibouti, Africa…" AR 2. The MARCENT command investigation and the administrative record contains no facts supporting that Plaintiff withheld information from his commanding officer. As previously noted, under OPNAVINST 3750, mishap board information is confidential and cannot be used punitively.

The problem with the contested fitness report is that it suggests that Plaintiff was dishonest in "withholding" information that was requested. At AR 3, Plaintiff noted that the incident was common on turbulent days and he did not need to report the incident. There are no facts in the administrative record suggesting that Plaintiff was ever dishonest with his commanding officer. Defendant's assertion that Plaintiff failed to provide evidence sufficient to suggest that he did not withhold the facts and circumstances of the incident is contradicted at AR 248. DN 7 ¶ 21. Plaintiff's commanding officer wrote a supportive letter stating that Plaintiff was always "honest, direct, and forthright with me." AR 248.

It is a clear injustice for Reporting Senior and BCNR to permit disingenuous language in a Marine Officer's evaluation. The comment is a substantive inaccuracy and an injustice that the BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

## F. PLAINTIFF'S ACTIONS FOSTERED AN EXTREMELY POOR COMMAND CLIMATE.

The final factual discussion is in regards to the Reporting Senior's comment that Plaintiff "fostered an extremely poor command climate, which prevented junior members from raising flight safety concerns." AR 7. This statement must have been in reference to Opinion #23 of the command investigation. AR 42, 219. Plaintiff analyzed this statement thoroughly at AR 42. The opinion was based upon 11 findings of fact in the command investigation. An examination of all 11 findings of fact before the BCNR is provided below for convenience and is also at AR 42-44:

> "Surely, the PERB has not concluded that Opinion #23, as restated in the fitness report, is fact. Nor can the PERB rationally conclude that it was an objective judgment based on Marine Corps standards. The opinion referenced findings of fact 15, 16, 18, 25, 27, 64, 65, 135, 240, 242, and 302, none of which were not logically related to any suggestion that Major Ludlow fostered an extremely poor command climate. For simplicity the specific findings of fact at TAB C underlying that statement are provided below:
>
> a. FoF 15: Completely redacted. Major Ludlow can never have a right of rebuttal concerning that finding.
>
> b. FoF 16: "Major Bartlett Ludlow was the [redacted] for this RCAX incident." This statement has nothing to do with allegations that he fostered an extremely poor command climate preventing junior members from raising flight safety concerns.
>
> c. FoF 18: "No mishap entries for the 25 October 2005 Class 'B' mishap were made in Captain Willard's NATOPS jacket or his Aviator's Flight Log Book." This finding of fact has nothing to do with the command climate.
>
> d. FoF 25: "No Aviation Flash Report was received by MAG 29 or MARCENT following the 18 January 2006 NVG dual point external lift incident." This finding of fact is misleading and contradicted by finding of fact 22 (TAB C, page 21), which states that no investigation was required or conducted. This statement cannot possibly be evidence of a poor command climate where junior members were discouraged from raising flight safety concerns.
>
> e. FoF 27: "The Commanding Officer of HMH-464 should have ensured that HMH-464 Detachment Bravo conducted monthly Standardization Boards and Human Factors Councils or conducted them for the Detachment." Major Ludlow addresses this issue at paragraph 25 of his supplemental statement. He was not required to conduct Standardization Boards and Human Factors Councils per the

16

following regulations: OPNAVINST 3750.6R page 2-4, MCO 5100.29A Enclosure 3 page 2 paragraph (i and j); 2D MAW Order 3710.38 Chapter 1 Sections 2 & 5; Marine Air Group Twenty-nine GruO P3750.7A Chapter 12 paragraph 12002; and HMH-464 Squadron Order 3750.3B. Again, the command investigation, the fitness report, and the PERB's advisory opinion are all blatantly wrong on this point.

f. FoF 64: "[Redacted] wrote an Aircrew Training Form (ATF) on First Lieutenant Dronet on 23 January 2006...in which he stated, "You are a professional Naval Aviator, and American families entrust their sons and daughters safety in your hands...Don't EVER come to a brief...that unprepared again..." If anything, this finding of fact is wholly consistent with a command climate that was concerned about flight safety.

g. FoF 65: "[Redacted] discussed 'turning in his wings'...on multiple occasions with members of HMH-464..." Cleary this aviator was concerned about flight safety. He was so concerned that he discussed turning his wings with the command. This is not evidence of a poor command climate that stifled junior aviators from expressing safety concerns.

h. FoF 135: "[Redacted] was removed from the flight schedule on 14 February 2006, only days prior to the mishap, due to insufficient crew rest and was replaced by First Lieutenant Dronet, who volunteered to take [redacted] place." This finding of fact cannot possibly support a statement that Major Ludlow fostered a poor command climate that prevented junior members from raising flight safety concerns. Clearly, the command was ensuring that well-rested and qualified pilots were flying missions.

i. FoF 240: "[Redacted] did not believe that he had sufficient command and control over his section due to the way it was scheduled with different Aerial Refueling Control Times for each aircraft." Firstly, Major Ludlow addressed command-level scheduling issues in his supplemental statement at paragraph 28. Limited rotary-wing assets required commanders to make complex decisions regarding the flight scheduling. Secondly, one statement from a section leader is not indicative of any particular command climate.

j. FoF 242: "In his capacity as the Detachment Aviation Safety Officer...as as flight section leader, [redacted] did not approach...Major Ludlow with his concern about insufficient command control over his Section as scheduled." Based on the referenced enclosures to this finding of fact, it is clearly based upon the same statement. Major Ludlow's response, is therefore the same as above in paragraph i.

k. FoF 302: "[Redacted] stated that Major Ludlow...told the First Lieutenants...that copilots don't question the Helicopter Aircraft Commander." There is no context this statement provided in the command investigation. This statement was based on enclosure 12, a summarized sworn statement. The name of the individual is

redacted. Nevertheless, one uncorroborated summarized sworn statement is never indicative of an overall command climate."

Defendant states that "Plaintiff habitually berated junior officers." DN 7 ¶ 21. Only Finding of Fact 64 (AR 174) appears to be related to that conclusion. That finding, however, does not involve Plaintiff. Though the name in the investigation is redacted, it was Captain Willard that told Captain Dronet "Don't EVER come to a brief…that unprepared again…" Defendant cannot seriously suggest that Finding of Fact 64 was evidence of Plaintiff's habitual berating of junior officers. Further, Finding of Fact 64 demonstrates that junior aviators were in fact concerned about flight safety, which contradicts the fitness report.

Plaintiff went to great lengths to provide the BCNR with six letters from senior officers ranging from a Major General to a Lieutenant Commander. AR 242-250. Plaintiff's Reporting Senior at the time of the mishap, Colonel Trafton, noted that Plaintiff's performance "and that of his detachment, was superb." AR 246. Plaintiff's commanding officer, Lieutenant Colonel Martinez, wrote that the "investigations applied the perfect clarity of hindsight to draw very damming, and in my opinion, in accurate, conclusions regarding the command climate and supervision." AR 248.

The comment that Plaintiff "fostered an extremely poor command climate, which prevented junior members from raising flight safety concerns" is a substantive inaccuracy and an injustice that the BCNR should have corrected. It was arbitrary and capricious, contrary to law, and unsupported by substantial evidence for the BCNR to conclude otherwise.

## G. THE BCNR ADOPTED THE INCORRECT STANDARD OF REVIEW.

Plaintiff agrees that the standard of review for fitness reports is whether there is sufficient evidence to demonstrate probable material error, substantive inaccuracy, or injustice in the report. MCO 1610.11C, 10(a). Simply because the Marine Corps produced an investigation, does not mean that the results of the investigation were incontrovertible matter of fact or even

18

objective. The fitness report in this case makes multiple assertions that are not supported by the investigation.

The BCNR, at the first level, had to determine whether there existed probable material error. That duty included determining whether the Reporting Senior (in a non-observed fitness report) properly determined that the derogatory material was incontrovertible matter of fact or acknowledged to be true by Plaintiff. BCNR adopted the standard from the advisory opinion that the Reporting Senior need only be sufficiently objective. The advisory opinion concluded that because the derogatory material was based on an investigation, the material was therefore "sufficiently objective to support the fitness report." AR 29. The "sufficiently objective" standard is not found in MCO P1610.7E . That standard is further contrary to the requirement that the derogatory information be "incontrovertible matter of fact" or "acknowledged to be true."

In denying Plaintiff relief, the BCNR stated that the Board "substantially concurred" with the advisory opinion. AR 14. In that regard, the BCNR erred in adopting the wrong standard of review – that the derogatory material was sufficiently objective rather than incontrovertible matter of fact. The BCNR's adoption, or substantial concurrence, of an incorrect standard was arbitrary, capricious, or otherwise contrary to the law.

On a second level, the BCNR had to determine whether there existed multiple substantive inaccuracies and a clear injustice. Even assuming that the BCNR applied the appropriate standards, the fitness report was filled with multiple instances of false derogatory material. The Board's failure to find probable material error, substantive inaccuracy, or injustice in the report was not support by the record.

## H. IT IS OF NO CONSEQUENCE WHETHER THE RO PROPERLY RESOLVED ALL FACTUAL INCONSISTENCIES IN FAVOR OF THE RS.

Defendant notes that the Reviewing Officer resolved all factual inconsistencies between Plaintiff and the Reporting Senior in favor of the Reporting Senior. D at 23. Plaintiff's view is that this fact is not of any consequence to this motion. The Reviewing Officer does not state which factual inconsistencies were resolved. AR 2. It might make a difference if the factual inconsistencies were resolved in Plaintiff's favor. Here, resolving factual inconsistencies in a non-observed adverse fitness report in favor of the Reporting Senior who did not observe Plaintiff's performance is simply another rubber stamp in the chain.

## VI. CONCLUSION

Under Federal Rule of Civil Procedure 56, Plaintiff respectfully requests that this Court deny the Defendant's motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

Respectfully submitted,

Gary Myers
Counsel for Plaintiff
DC Bar # 157115
78 Clark Mill Road
Weare, NH 03281
Ph: 800-355-1095
Email: myers@mclaw.us
Fax: 603-529-3009